**Charles A. PETTIT, Appellant
(Petitioner Below),**

v.

**INDIANA ALCOHOLIC BEVERAGE
COMMISSION, Appellee
(Respondent Below).**

No. 23A01–8609–CV–261.

Court of Appeals of Indiana,
First District.

Aug. 3, 1987.

Charles R. Deets, III, Heide Sandy Deets & Kennedy, Lafayette, Thomas J. Werner, Thomas J. Werner, P.C., Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Frank A. Baldwin, Deputy Atty. Gen., Office of the Atty. Gen., Indianapolis, for appellee.

ROBERTSON, Judge.

The appellant-petitioner Charles A. Pettit (Pettit) filed a petition for judicial review pursuant to IND. CODE 7.1–3–23–11 of an order entered by the appellee-respondent Indiana Alcoholic Beverage Commission (ABC) which denied the renewal of Pettit's alcoholic beverage permit. The trial court found against Pettit with this appeal resulting.

In conjunction with his ownership of a tavern, Bud's Pub, in Covington, Indiana, Pettit held a type 210 permit issued by the ABC.

On the night of July 20, 1984, a multi-police department undercover operation made an investigation at Bud's Pub. At one point in the evening a part-time bartender employed by Pettit left the building and once outside of the tavern made a sale of cocaine. The raid team descended upon and arrested the bartender.[1]

The arrest prompted action on two fronts.

The ABC filed three charges against Pettit: Storage of alcoholic beverages in the basement of the building where the tavern was located when that particular area was not shown to be a part of the permit premises on floor plans filed with the ABC; failure to break empty liquor bottles; and, failure to maintain a high and fine reputation because a narcotics transaction had occurred on the permit premises.

On November 2, 1984, an administrative hearing was held before an ABC hearing judge on the three charges. A subsequent ruling on November 30, 1984, by the hearing judge found Pettit had failed to break empty liquor bottles and had stored beverages in the basement for which Pettit was fined a total of $500. As to the failure to maintain a high and fine reputation the hearing judge found that there was no evidence to show that Pettit knew of drug sales in the tavern and no evidence to "establish that the permittee had knowledge of the facts which would indicate any degree of participation by the permittee in such transaction." No penalty was levied on this charge. Pettit also filed amended floor plans with the ABC to allow beverage storage in the basement. On December 5, 1984, the ABC adopted the hearing judge's findings and determinations without change.

Meanwhile, back in Covington, Pettit filed his application for the annual renewal of his permit which was due to expire on November 24, 1984. Because Pettit was involved in a minor automobile accident and unable to attend the regular local board meeting[2] scheduled for November 13, 1984, the matter was continued to the December 11, 1984 meeting.

The December meeting was presided over by excise officer Monjon, the local board member designated by the ABC. Monjon acknowledged that a violation hearing had been held in Pettit's case but apparently he was unaware of the ABC's decision rendered six days earlier. Two excise officers, who had also testified at the administrative hearing, appeared before the local board and reiterated the

---

1. The transcript of local board hearings shows that Jim Pettit, a son of Pettit, was also subsequently arrested. However, the record does not indicate whether that arrest was a direct result of activities on July 20th nor is there any indication of the relevancy of the younger Pettit's arrest as it relates to Pettit's license renewal.

2. The duties and composition of the local boards are found at IND. CODE 7.1–2–4–1 et seq.

**314**

events of the July 20th arrest of the part-time bartender. Monjon announced his intention to vote against the renewal. After discussion, and for differing reasons, the local board voted to continue the matter until the January 1985, meeting at which time the results of the previous administrative hearing would be known. Monjon warned Pettit to "watch it real close" and he additionally stated that no new testimony would be presented by anyone at the next meeting.

At the January meeting the Chief of the Covington City Police Department testified over the objection of Pettit's counsel. The chief stated that during 1984 his department received 30 calls to Bud's Pub, 12 calls to Billy's Bar and the Friendly Tavern (the record is not clear as to whether 12 calls were received from each place or collectively from both) and no calls to the V.F.W. There was no record as to the exact nature or source of the calls to Bud's Pub although the Chief allowed that one was from Pettit complaining that his dog had been shot. Pettit testified that he had instructed his employees, which included a number of women, to call the police at the first sign of trouble. The county prosecutor then testified to the local board about the events leading up to the arrest on the night of July 20, 1984. The prosecutor made no recommendation for or against renewal of Pettit's permit. The next witness was the judge of the Fountain Circuit Court.[3] He testified about the history of the tavern before and after Pettit's ownership and that local authorities tried to resolve problems that arose in the establishment. He also thought Bud's Pub was better managed over the last six to eight months as opposed to two years before. After all of the foregoing, Monjon then mentioned Lois Sheppard. Apparently, Sheppard was a former part-time employee of Bud's Pub who had been arrested on marijuana charges. The following colloquy occurred between Dean (Pettit's attorney) and Monjon:

 Dean  Sir, (UNABLE TO HEAR) question is a little strange, that you've

gone to that extend (sic), to dig that up. What that situation was all about was her husband was growing marijuana in their back-yard. And, she was the, *that had absolutely nothing to do with (sic) tavern, whatsoever.*

Monjon  *I realize that,* but it (sic) showing (sic)

Dean  But, you're not telling the board that you realize that.

Monjon  I'm not understanding what you're saying.

Dean  I'm saying that you are prejudice (sic). And, that you are going back and picking up things that have nothing to do with the tavern.

Monjon  I think it (sic) showing you (sic) character, when he hires this type of individual.

Dean  Well, she was never found quilty (sic) of anything. Her husband grew marijuana in their back-yard. And, that is what he was busted for and they busted her too, and they dismissed the charges against her. *And, it had nothing to do with the tavern, whatsoever.*

Monjon  *I realize that* (sic) (Record p. 206 II. 14–28, p. 207, II. 1–7, Discussion between Dean and Board; emphasis added.)

Although the stated purpose of continuing Pettit's renewal to the January meeting was to receive the results of the administrative hearing, it was only mentioned in passing and not discussed or considered at that meeting. After some discussion on whether to approve the renewal, the local board apparently voted to approve the renewal provided it was placed in escrow and sold by Pettit to a qualified buyer approved by the local board.

Thereafter the ABC voted to uphold the local board's recommendation and also granted Pettit's request on the local board's decision. As a result of Pettit's appeal, the ABC ordered that Pettit's application be re-advertised and remanded the application to the local board.

---

**3.** The Fountain Circuit judge also presided over the judicial review from which this appeal

arises. He so advised counsel of both parties and was not disqualified from the cause.

The next regular meeting of the local board was held on March 12, 1985. Time was such that Pettit's application for renewal could not be published in compliance with I.C. 7.1-3-19-5 and qualify for hearing at the March meeting. Nevertheless, and in the absence of Pettit and his attorney, one local board member said they had to decide what they were going to do with Bud Pettit. That member said to close the door of the meeting room so discussion on the Pettit case could be held. After the door was closed another local board member, Morris Poer, registered his belief that such action was illegal. Monjon advised Poer that it was an informal meeting and that they could do whatever they pleased in that type meeting. Poer was not satisfied with that and reiterated his position that the meeting was illegal. Monjon responded with the fact that he had talked with the head of the state excise office and with Attorney General Pearson and that "there was no problem", apparently meaning that the closed door session was legal. Poer uttered a remark which could be construed as disdain for Monjon's opinion. Poer left the meeting and later that day resigned from the local board. The record does not reveal what then transpired.

The local board met again on April 9, 1985. No action was taken on Pettit's application for renewal because Poer's replacement needed time to review tapes of prior meetings.

Pettit's application was not considered at the regularly scheduled local board meetings in May or June, 1985.

At the July 9, 1985 local board meeting the Prosecutor reappeared. As best as can be deduced, the Prosecutor informed Monjon that Jim Pettit was late and drunk when he reported to authorities to commence his six year jail term. The Prosecutor also gave Monjon an affidavit, signed by a Robert Wesley Thompson, which stated that Thompson was served alcoholic beverages at Bud's Pub on December 1, 1984, when Thompson was a minor.

At the August 13, 1985, meeting Monjon showed the Thompson affidavit to the rest of the board. Pettit testified that he had instructed his employees, including the one on duty the night the underage Thompson patronized Bud's Pub, to check the identification of anyone who appeared to be underage. The local board then voted unanimously to deny Pettit's renewal citing Commission Rule 27 (905 I.A.C. 1-27) as the basis of their vote.

Pettit appealed the ruling to the ABC. Morris Poer testified at that hearing, and of particular interest is his testimony relating to the way the local board conducted its business.

> Poer  Not me as an individual personally, but in groups. We would, when I say groups, *after almost every alcoholic beverage meeting, they would adjourn, go to one of the local taverns,* and set (sic) and have a couple of drinks, and [ ...]
>
> Deeds (sic)  Talk about Bud Pettit?
>
> Poer  And, *this is where most of the business was talked* (sic). *And, after the drug bust, it become* (sic) *Bud Pettit all the time.*
>
> Deeds (sic)  And, did DeHaven[4] try to sway you that he [Pettit] was quilty (sic) and his license should be taken away?
>
> Poer  Yes Sir, he did.
>
> Deeds (sic)  And, this outside the presents (sic) of any formal board meeting, taking place in taverns?
>
> Poer  Correct[.]
>
> Deeds (sic)  So, when this was remanded back, its (sic) fair to say that the board had already made up their mind that, from back in July of 84, to take his license away?
>
> Poer  *I feel that they had, yes Sir.* (Emphasis added.)

Poer also stated that discussion about Pettit started shortly after the July 20, 1984 raid, before anything formal was before the local board, and that it was Poer's personal opinion that the local board members at that time formed opinions that Pettit was as guilty as the part-time bartender.

---

4. DeHaven was a local board member.

The ABC rejected Pettit's appeal by adopting the hearing officer's findings on January 21, 1986. Among other things, Pettit was ordered to place his permit "in escrow for the purpose of sale to a person or entity with whom [Pettit] has no business interest."

As previously noted the trial court denied Pettit's petition for judicial review with this appeal following.

Pettit divides the several issues into two groups: Whether Pettit was denied a fair hearing and due process; and, whether the decision of the ABC is contrary to law, arbitrary, capricious, and exceeds statutory authority. Because we reverse only the questions which pertain to due process will be discussed.

■ The ABC reminds us of the stringent standard of review in appeals from an administrative agency. Generally speaking, we are limited to a determination of agency jurisdiction, whether the decision under appeal was made in accordance with proper legal procedure, whether the decision was based upon substantial evidence and whether there were any constitutional or legal principles violated. *Clarkson v. Department of Insurance* (1981), Ind.App., 425 N.E.2d 203. If the ABC has complied with procedural requirements and the decision is supported by substantial, reliable, and probative evidence, we may not disturb the decision. *Department of Financial Institutions v. State Bank of Lizton* (1969), 253 Ind. 172, 252 N.E.2d 248. This is so even if the reviewing court would have reached a different result. *Department of Financial Institutions v. Colonial Bank and Trust* (1978), 176 Ind.App. 368, 375 N.E.2d 285.

■ As a part of Pettit's first issue, it is argued that the local board violated I.C. 5–14–1.5–1 *et seq.*, the Indiana Open Door Law, on several occasions. There is no doubt that the local board is subject to the provisions of the Open Door Law, *see* I.C. 5–14–1.5–2 and I.C. 5–14–1.5–3, and that the facts give strong indication that there was a violation of the statute as indicated by the testimony of former local board member Morris Poer as it related to the

meeting of March 12, 1985, and as it related to the local board's practice of going to a local tavern after a regular meeting and discussing matters which concerned the business of the local board. However, the violation and remedies section of the Open Door Law, I.C. 5–14–1.5–7, makes it clear that, under the facts of this case, any action to declare the acts of a governing body null and void must be taken within 30 days of the act or failure complained of. Further, we are of the opinion that the word "action" as used in I.C. 5–14–1.5–7 contemplates the filing of a lawsuit in a court of competent jurisdiction. Pettit, through his attorneys, made known his objections to the local board's failure to comply with the Open Door Law at several stages in the proceedings. Those objections, standing alone, are not enough to allow us to declare the local board's conduct null and void. Additionally, more than 30 days passed making Pettit's contentions about Open Door law violations untimely.

The essence of the other argument relating to the fair hearing and due process issue is summarized in the following from *City of Mishawaka v. Stewart* (1974), 261 Ind. 670, 310 N.E.2d 65:

> It is essential that the fact finders comport to due process standards. It also follows that the fact finding process should be free of suspicion or appearance of impropriety.

310 N.E.2d at 69.

In *Mishawaka, id.,* the city attorney served as a fire department advocate in presenting a case seeking the discharge of a tenured fireman to the city Board of Public Works and Safety. The city attorney then voted as a member of that Board to fire the fireman. The procedure was violative of due process and prompted the supreme court to hold, among other things, that an administrative board hearing is not required to be conducted with all of the procedural safeguards associated with the judicial system; however, there are certain standards below which a board should not go. The procedural safeguards before an administrative agency should be at the highest level which is workable under the

circumstances, and the fact-finding process should be free of suspicion or the appearance of impropriety. *City of Mishawaka, id.* We are of the opinion that under the totality of the circumstances the Pettit renewal process is too tainted to successfully survive scrutiny under the holdings of *City of Mishawaka.*

■ Pettit first argues about the role of Monjon in the investigative process. In comparing Monjon's performance with that of the city attorney in *City of Mishawaka, id.,* Pettit points out that Monjon presided over the meetings, ruled on objections and the admissibility of evidence; called, questioned, and cross-examined witnesses; acted as an advocate in seeking the denial of Pettit's renewal; and, voted on the matter. Recalling that virtually most, if not all, of the foregoing occurred subsequent to Monjon's expressed position that he was going to vote to deny the petition for renewal, we are of the opinion that, at best, any appearance of propriety vanished. Due process requires that those functioning in a quasi-judicial capacity be impartial. *Hearing & Speech Clinic v. Ind. Dept. of Welfare* (1984), Ind.App., 466 N.E.2d 462. Along the same line, the uncontroverted testimony of Morris Poer shows that the impartiality of other local board members began to wane shortly after the incident of July 20th, long before the renewal proceedings commenced.

In addition there are some procedural deficiencies which occurred that do not comport with fair play or due process. As one example, at the close of the December, 1984 meeting Monjon announced that no new evidence would be taken relating to the Pettit renewal. Then, at the January, 1985 meeting a number of witnesses appeared and gave testimony directed to Pettit's renewal. The record does not reflect who marshalled the witnesses and their testimony for the meeting; however, it is clear that someone made the arrangements. It is equally clear that the complete turnabout in Monjon's declaration about new evidence came as a surprise to Pettit and his attorney. Such procedural inconsistency is inimical to the concept of due process, in our opinion.

■ Another flaw of noticeable magnitude involves the failure of the local board to adhere to the ABC's rules relating to the fact-finding function. The local board, in acting upon new or renewal permits, is obligated to fill out schedule LB. One section of schedule LB is captioned in bold type "THESE QUESTIONS ARE TO BE ANSWERED BY THE LOCAL BOARD. ALL QUESTIONS MUST BE ANSWERED." Thereafter eight questions follow pertinent to the issuing or renewal process with each question having a box to mark for a yes or no answer. No marks of any sort were made. Additionally, the front page has a notation that the renewal was disapproved for one of the following reasons: quota, undesirable, and, other. None of the three are marked. Although discussion in the transcript of the local board meeting would indicate some reliance on the public nuisance concept there is nothing to verify that on the form used by the local board. Findings of fact are absent in this case, even though they are required by I.C. 4-22-1-10. As held in *Hawley v. South Bend Dept. of Redevelopment* (1978), 270 Ind. 109, 383 N.E.2d 333, all administrative agencies must, in all cases, set out written findings so the court on appeal may intelligently review the administrative decision. We are aware that the failure to make findings is a technical defect which can be cured by remand. *State Bd. of Tax Com'rs. v. Stone City Plaza, Inc.* (1974), 161 Ind.App. 627, 317 N.E.2d 182. However, under the facts of this case remand would be of no value because of the flawed nature of the investigation and fact-finding procedure.

One other aspect of the failure of the local board to find facts is troublesome. The ruling made by the ABC hearing judge on November 20, 1984, subsequently adopted by the ABC on December 5, 1984, specifically absolved Pettit of any blame relating to the events of July 20, 1984.[5]

---

5. The trial court found that there was nothing in the administrative record to show Pettit was implicated in any way with the illegal sale of cocaine on the 20th of July, 1984.

Under virtually any fair system of fact-finding the matter of the raid and Pettit's non-involvement therein would be precluded from further consideration because of the determination by the ABC. However, at least according to Morris Poer's accounts, the raid and arrest of the part-time bartender remained a substantial factor in forming the local board's opinion.

In conclusion, the admonition to administrative agencies pronounced in *City of Mishawaka, supra,* requires a procedure which comports with due process, albeit more informal than that utilized in the judicial system. In this case we find that the proceedings leading to the non-renewal of Pettit's liquor permit were highly suspect given the apparent bias of the fact-finder. The attendant deficiencies in the investigative and fact-finding process gave the proceedings the appearance of impropriety.

Judgment reversed.

NEAL and HOFFMAN, JJ., concur.